# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY<br>STATE OF COLORADO<br>1777 6th St.<br>Boulder, CO 80302 | DATE FILED: April 7, 2023 3:33 PM<br>FILING ID: D545893C5D82D<br>CASE NUMBER: 2023CV30250 |
| **SHAYLEY DUMPERT,**<br>**VICTORIA SHELLADY,**<br>**EVA SPIEGEL,**<br>**WHITNEY SHERIFF,**<br><br>    Plaintiffs,<br><br>v.<br><br>**LUSH COSMETICS, LLC d/b/a LUSH HANDMADE COSMETICS,** a foreign corporation,<br><br>    Defendant. | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff:*<br><br>Siddhartha Rathod, #38883<br>Azra Taslimi, #44317<br>RATHOD ǀ MOHAMEDBHAI LLC<br>2701 Lawrence Street, Suite 100<br>Denver, CO 80205<br>(303) 578-4400 (t) / (303) 578-4401 (f)<br>sr@rmlawyers.com<br>at@rmlawyers.com | Case No:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** ||

   Plaintiffs Shayley Dumpert, Victoria Shellady, Eva Spiegel, and Whitney Sheriff, by and through Siddhartha Rathod and Azra Taslimi of RATHOD ǀ MOHAMEDBHAI LLC, respectfully allege for their Complaint and Jury Demand as follows:

### I.      NATURE OF THE CLAIMS

   This case is about a national company professing to uphold community ideals while blatantly violating the numerous rights of its workers. Three young women – Shayley Dumpert, Eva Spiegel, and Whitney Sheriff – complained of sex-based harassment and bullying by their manager-in-training at LUSH Boulder, Logan Hampton. When the manager of the store, Victoria Shellady, reported the misconduct to LUSH corporate managers, Ms. Yarbrough, Ms. Morgan and

Mr. Dynes, they belittled and ignored her and accused the young female employees of fabricating their claims. After enduring many more months of harassment, Mses. Dumpert, Spiegel and Sheriff banded together and protested corporate's inattention to the sexually hostile and toxic work environment at the LUSH Boulder store. In response, LUSH fired Ms. Shellady for reporting the harassment and Mses. Dumpert, Spiegel, and Sheriff for engaging in protected activity, violating the Colorado Anti-Discrimination Act ("CADA"), other municipal and federal civil rights statutes, and the National Labor Relations Act ("NLRA"). LUSH claims in its Ethical Charter to be "a company that strives to do good business without exploiting people," but clearly such guidelines are nothing more than a public relations stunt.

## II.     PARTIES, JURISDICTION, AND VENUE

1. At all relevant times, Ms. Victoria Shellady ("Shellady"), is resident of and domiciled in the State of Colorado.

2. At all relevant times, Ms. Shayley Dumpert[1] ("Dumpert"), is resident of and domiciled in the State of Colorado.

3. At all relevant times, Ms. Whitney Sheriff ("Sheriff"), is resident of and domiciled in the State of Colorado.

4. At all relevant times, Ms. Eva Spiegel ("Spiegel"), is resident of and domiciled in the State of Colorado.

5. Defendant LUSH is a foreign corporation duly registered with the Colorado Secretary of State and doing business in the state of Colorado.

6. LUSH operates or manages more than 200 stores across the country, 3 of which are located in Colorado, one of which is located in Boulder, Colorado.

7. All four plaintiffs worked for LUSH in Boulder, Colorado ("LUSH Boulder").

8. LUSH Boulder is a covered employer under the Colorado Anti-Discrimination Act.

9. This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

10. Venue is proper pursuant to C.R.C.P. 98, as all the events or omissions giving rise to the claims herein occurred in this district.

## III.     ADMINISTRATIVE EXHAUSTION

---

[1] Ms. Shayley Dumpert married after her employment at LUSH and now goes by the name of Shayley Eckhoff. For the purposes of this complaint, we will use her maiden name, Shayley Dumpert.

2

11. Mses. Dumpert, Spiegel, Sheriff, and Shellady each dual filed a separate Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Colorado Civil Rights Division ("CCRD") on May 20, 2022.

12. The CCRD/ EEOC investigated the Charges of Discrimination and requested that LUSH file their position statement for the charges.

13. LUSH ignored the agency's request, and no position statement was filed with either the CCRD or the EEOC.

14. The Charges of Discrimination included allegations of sex and disability discrimination and retaliation.

15. The EEOC issued the Plaintiffs each a Notice of Right to Sue on January 31, 2023.

16. Plaintiffs have filed this action within 90 days of the date the EEOC issued the Notices of Right to Sue.

## IV.   FACTUAL ALLEGATIONS

17. Shayley Dumpert started at LUSH Boulder in July of 2021.

18. Ms. Dumpert had years of skincare retail experience under her belt and was excited to be a part of the LUSH brand and a new team in a new store.

19. Whitney Sherriff began working for LUSH on June 4, 2021.

20. Ms. Sherriff was attracted to LUSH because of the progressive messaging around empowerment of women, the LGBTQ community, and mental health awareness.

21. Ms. Sheriff felt the values of the company would lead to a positive work environment.

22. Eva Spiegel was hired by LUSH Houston in the fall of 2018 as a seasonal sales ambassador.

23. Ms. Spiegel then moved into a core staff position at the end of her fall 2018 holiday contract.

24. She continued in that position with LUSH until May of 2019, when she moved to Colorado.

25. Towards the end of May 2021 corporate headquarters requested that Ms. Spiegel apply at LUSH Boulder.

3

26. LUSH then hired Ms. Spiegel again in June 2021 as a sales associate.

27. At the time of her hire, Ms. Spiegel was the only staff at LUSH Boulder, besides Mr. Hampton (the Interim Store Manager at the time), with prior LUSH experience.

28. All three women were excited to be working at LUSH because they considered it to be a socially conscious cosmetics company with progressive values.

29. Many of LUSH's employees are drawn to the company out of a desire to be part of its brand identity which emphasizes an ethical and community-based ethos.

30. LUSH prides itself as cruelty free, sourced from vegetarian ingredients, sold wrapped in recycled materials, and giving a portion of their profits to support projects such as animal protection, regenerative farming, and climate change.

31. The brand has built its success by marketing itself as a leader for ethical campaigns, advancing social issues through charitable giving and brand support.

32. More recently the company rolled out their 90-day action plan to improve diversity and inclusion at LUSH in support of the Black Lives Matter movement. The plan even called for a review of the current anti-harassment policy to identify gaps and ways to evolve the current policy to encompass anti-discrimination. "It was determined that there was a need for stronger language and more clearly-defined policy language, as well as more clarity around what staff can expect when raising a concern around discrimination and harassment." https://www.lushusa.com/stories/article-action-plan-update.html

33. Despite its progressive messaging, LUSH Boulder failed to deliver a positive work environment for the young female staff that made up most of its employees.

34. Throughout the onboarding of Mses. Dumpert, Spiegel and Sheriff, the Boulder LUSH store was managed by Mr. Logan Hampton.

35. As manager, Mr. Hampton subjected Mses. Dumpert, Spiegel, and Sheriff to a litany of discriminatory behaviors rooted in gender-based biases, failed to accommodate an employee's disability and routinely patronized and bullied them:

    a. On one occasion, Mr. Hampton stared at Ms. Dumpert's buttocks, commenting that she had "a hand imprint on her ass."

    b. Mr. Hampton scheduled Ms. Dumpert to close alone almost every night as punishment for questioning him.

    c. Mr. Hampton routinely yelled at Ms. Sheriff in public about her job performance.

4

    d. Mr. Hampton failed to accommodate Ms. Spiegel's disability. After she objected, he threatened to punish her.

    e. Madison King, a female employee at LUSH Boulder, told Mr. Hampton that she did not want to be touched and Mr. Hampton hugged her anyway.

    f. Mr. Hampton lied about completing tasks and then blamed and yelled at staff for his errors when management discovered the deficiencies.

    g. After assigning tasks to employees, Mr. Hampton routinely took issue with how the task was done, demeaned employees for not completing the task correctly and ordered employees to repeatedly complete tasks as punishment.

36. Victoria Shellady came to LUSH Boulder in August of 2021 as the store manager.

37. Up until Ms. Shellady's arrival, the LUSH Boulder female staff had not been provided an employee handbook nor trained on where and to whom they should report gender-based or sexual harassment or bullying.

38. Ms. Shellady, upon arrival, could sense that there was tension and store staff exhibited a sense of uneasiness. Specifically, during Ms. Shellady's first store meeting she noticed that all the female staff members seemed on-edge.

39. Hoping to get to the root of the problem, Ms. Shellady created a survey and distributed it to the staff to understand the problems and their source.

40. The results of the survey revealed that the staff complaints were directed at Mr. Hampton. The female staff cited feeling unsupported by him when it came to their mental health, others alluded to uncomfortable behaviors by him such as calling them "honey," "darling," "my love," approaching them from behind and standing closer than appropriate, prying for personal information, and patronizing them in front of each other and customers.

41. Staff also confided in the survey about the lack of training they received from Mr. Hampton and the passive-aggressive tone and bullying behavior he exhibited when they asked questions, all of which seemed particularly gendered, given that he never treated the one male staff member this way.

42. Although only at the Boulder store for a short amount of time by then, Ms. Shellady was able to observe Mr. Hampton's misconduct. She could see that he responded to female staff passive-aggressively – making comments under his breath when asked to repeat things, walking away when asked a question by female staff members, and using mocking or sarcastic tones when dealing with them.

43. Ms. Shellady noticed that the one male staff member at LUSH Boulder did not have share the same concerns with Mr. Hampton as the female staff.

44. Mr. Hampton's behavior was not conducive to a congenial work environment and Ms. Shellady requested that he correct his behavior and maintain a better relationship with store staff.

45. Ms. Shellady further asked that Mr. Hampton complete LUSH leadership courses (the courses focus on leadership, people safety, and diversity programs) and create a plan where he and Ms. Shellady would have one-on-ones with staff members to improve how he coached and provided feedback.

46. Mr. Hampton, instead of acting on Ms. Shellady's action plan and completing the leadership course, began hiding his bad behavior towards female employees when she was present.

47. Staff advised Ms. Shellady that Mr. Hampton changed his behavior only when she was present at the store but not the rest of the time. According to female staff, he continued to act passive-aggressively towards them and dismissed and belittled them outside of her presence.

48. Instead of scheduling one-on-one meetings with staff and with Ms. Shellady present, Mr. Hampton stated that he had already engaged with staff on his own. When Ms. Shellady followed up with staff, they provided a contradicting narrative.

49. Mr. Hampton never enrolled in or completed the leadership course, despite repeated reminders from Ms. Shellady.

50. On September 17, 2021, in a management meeting with Ms. Sasha Chiglo, Management Training Specialist for LUSH North America, Ms. Shellady expressed to her that staff felt uncomfortable around Mr. Hampton and feared having to work with him.

51. Specifically, Ms. Dumpert had confided in Ms. Shellady that she was fearful of Mr. Hampton due to his habit of sexualizing behavior, demeaning comments, and leaving her on the floor for long periods of time without breaks or support.

52. Ms. Chiglo advised Ms. Shellady not to discuss the issue with Mr. Hampton and that they would schedule a meeting in the future and discuss the concerns with him together.

53. Mr. Hampton was out on medical leave starting September 14, 2021 and was anticipated to return to work on September 30. He was additionally scheduled for medical leave again from October 11 to November 9, 2021.

54. During Mr. Hampton's second medical leave, a few staff members approached Ms. Shellady and requested to speak with her about additional concerns they had regarding Mr. Hampton.

55. It was during this time that Ms. Shellady grew increasingly alarmed as she learned more details of Mr. Hampton's sexually harassing behavior towards female staff.

56. Ms. Dumpert disclosed to Ms. Shellady that Mr. Hampton had made several comments to her about her body and her appearance.

57. Ms. King told Ms. Shellady that Mr. Hampton hugged her without consent, despite Ms. King having told him "No."

58. Ms. Shellady gathered the information from staff members by requesting written narratives and, on October 28, 2021, emailed them to Caity Yarbrough, LUSH's regional manager for the western region, which encompassed Colorado.

59. Ms. Shellady in her email pointed out that Mr. Hampton "has proven to be a detrimental and toxic leader to this team." She outlined examples of his behavior and actions and requested that he be moved to a different store. The narratives from Ms. Dumpert and Spiegel included the following language:

   a. "[Mr. Hampton] was looking at me in a way that made me feel uncomfortable and sexualized… it felt like he was trying to embarrass me and sexualize me… As someone who is a sexual assault survivor it was extremely triggering and I had a horrible PTSD attack that day. Now at work it is extremely hard to be around him without feeling extremely uncomfortable."

   b. "I am both frustrated and incredibly anxious when he is present in the store because I am constantly on edge about comments he could make."

   c. "He has repeatedly made me uncomfortable and made me feel like I had to sacrifice my health in order to continue to work here."

60. Upon receipt of Ms. Shellady's October 28 email, Ms. Yarbrough brought Beka Morgan, North American Retail Support Team, into the email thread.

61. Ms. Morgan called Ms. Shellady the morning of November 8, 2021, requesting additional details regarding staff concerns with Mr. Hampton.

62. It took ten days for a representative from LUSH corporate to reach out to Ms. Shellady.

7

63. Even then, Ms. Morgan admitted that while she was familiar with some details, she had not taken the time to review all the documents Ms. Shellady had forwarded to Ms. Yarbrough.

64. On the phone call with Ms. Morgan, Ms. Shellady recounted staff's allegations of gender-based and sexual harassment and bullying against Mr. Hampton and talked about the need for his termination or at the very least that he needed to be moved to a different store.

65. Ms. Morgan downplayed Mr. Hampton's behavior towards staff, telling Ms. Shellady that she "didn't know if what happened to Shayley [Ms. Dumpert] and Madi [Ms. King] counted as sexual harassment" and ordered Ms. Shellady to hold off on conferencing with Mr. Hampton about the issue.

66. Ms. Morgan then called Ms. Shellady back the same day at around three in the afternoon. On that call, she told Ms. Shellady that Mr. Hampton would never be fired or moved to a different store.

67. Ms. Shellady protested, arguing that LUSH has a zero-tolerance policy on sexual harassment. Ms. Morgan stated that LUSH had "a process" and Ms. Shellady needed to draft and deliver a "SMART" plan to Mr. Hampton.

68. Since Ms. Shellady had never been provided with an employee handbook giving advice or instructions on how a manager was to address such behavior, she relied on direction from LUSH corporate to respond to the situation.

69. None of the employees at LUSH Boulder, including Mses. Dumpert, Spiegel and Sheriff, were ever provided with an employee handbook or any EEO policies.

70. Ms. Shellady also inquired about what she should communicate to staff who were feeling anxious and uncomfortable with Mr. Hampton returning the next day to work. Up until then, he had been temporarily out on medical leave.

71. Ms. Morgan directed Ms. Shellady to advise staff that "they needed to work harder to build a bridge with their MIT (manager-in-training) [Mr. Hampton]."

72. Ms. Shellady told Ms. Morgan that given the severity of Mr. Hampton's behavior and impact on staff, there was no bridge to rebuild and that delivering a SMART plan would not repair the relationship.

73. Ms. Shellady also opined that, if anything, the SMART plan would create a much heavier, negative environment for all involved.

74. However, Ms. Morgan insisted that Ms. Shellady proceed as originally instructed.

8

75. With the news of Mr. Hampton returning back to LUSH, Ms. Dumpert submitted her two-week resignation letter citing "general and sexual harassment" by Mr. Hampton and corporate's "negligence and complete disregard" in addressing the harassment.

76. Ms. Shellady updated impacted staff regarding her communication with the corporate office and management's decision to continue Mr. Hampton's employment at LUSH Boulder. She further advised that staff was welcome to reach out directly to LUSH Human Resources for additional support.

77. On the afternoon of November 12, 2021, Ms. Shellady was pulled into a phone call with Ms. Yarbrough, Ms. Morgan and Stephen Dynes, Human Resources Compliance Program Manager, during which time she was advised that she should not allow store staff members to discuss their complaints about Mr. Hampton amongst themselves.

78. They relayed to Ms. Shellady that she was expected to get the store staff under control and rebuild a bridge between them and Mr. Hampton.

79. Mr. Dynes stated that Mr. Hampton's actions did not constitute sexual harassment, but they would reach out to the impacted parties to investigate.

80. However, LUSH corporate never spoke to or interviewed any of the impacted female employees.

81. In addition, Mr. Dynes caught wind, through a customer complaint, about a potential "staff walk-out" scheduled for December. Ms. Shellady advised that she was not aware of any plans by employees to engage in a walk-out, but Mr. Dynes nevertheless directed Ms. Shellady to stop this type of behavior immediately.

82. He threatened Ms. Shellady that "it would not be advantageous to her [Shellady]" if the employees were found to be engaging in such behavior.

83. Mr. Dynes also stated that the employees would face swift consequences but did not go into details as to what those consequences would be.

84. A secondary call between Ms. Yarbrough, Ms. Morgan and Mr. Dynes took place on November 19, 2021.

85. During the conversation Ms. Yarbrough, Ms. Morgan and Mr. Dynes seemed more concerned with Ms. Shellady and Mr. Hampton's working relationship -- reducing it down to a difference in expectations. They also continued to gloss over of the staff complaints.

86. During the call the following statements were made by Ms. Yarbrough, Ms. Morgan and Mr. Dynes:

9

    a. "This isn't sexual harassment"

    b. "We need to decide what we are doing next here -- who we are letting go"

    c. "It's very difficult to get fired here"

    d. How did "[Mr. Hampton] get turned into Hitler"

    e. "Why didn't the staff report this before"

    f. "This is a 'drama triangle.'"

87. Ms. Shellady found these statements offensive and dismissive of the concerns voiced by female staff, as it suggested that their complaints were nothing more than mere drama rather than legitimate concerns.

88. Ms. Shellady was also shocked that instead of taking the female staff's concerns seriously and investigating, Ms. Yarbrough, Ms. Morgan and Mr. Dynes were instead attacking, threatening, and denigrating the victims of Mr. Hampton's behavior as well as herself for reporting it.

89. In response to Mr. Dynes question about "why didn't the staff report this [Mr. Hampton's behavior] before," Ms. Shellady explained that staff had not mentioned Mr. Hampton's behavior until she arrived at the store because they did not know who to report to, given the company's lack of sexual harassment policy and training. She further described how the tension in the store was obvious to her the minute she started working there.

90. To Ms. Shellady, staff's failure to report Mr. Hampton's behavior in real time seemed understandable since there was no employee handbook provided to LUSH staff on whom such conduct was to be reported to.

91. Ms. Shellady reminded Ms. Yarbrough, Ms. Morgan and Mr. Dynes that the staff did not feel safe in the store's work environment and suggested again that the best solution was to fire Mr. Hampton in light of the sexual harassment allegations.

92. She also relayed that staff had told her they could not continue to work in such a hostile work environment. She conveyed that staff had informed her that if no efforts were made by LUSH to stop the harassment, they would resign on December 15 because remaining at work was unsafe.

93. Mr. Dynes stated that "staff often bluffs these things," further stating that he doubted staff would "follow through."

94. At this juncture, it became painfully obvious to Ms. Shellady that the gender-based and sexual harassment and toxic work environment allegations were not a concern for Ms. Yarbrough, Ms. Morgan and Mr. Dynes, nor was the well-being of their workforce.

95. Ms. Shellady informed the working staff the same day that Mr. Hampton would continue in his current position at LUSH Boulder for the foreseeable future.

96. The staff was obviously distressed by the message, especially since no one from corporate had made any effort to reach out to or interview any of them.

97. Ms. Shellady was informed by Mses. Sheriff, Dumpert, Spiegel and Kylie Lover that they were unable to continue working at the store without an intervention due to the detrimental effect of the stressful and toxic work environment on their mental health. They expressed concern that Mr. Hampton would continue to subject them to unwarranted outbursts and inappropriate comments about their physical appearance, with no action taken in response to their complaints.

98. They advised Ms. Shellady that they would be organizing together to leave the store at 1 pm that day to get the attention of corporate to take their concerns regarding Mr. Hampton more seriously and to do something about their hostile work environment. All of them planned to return back to work for their next scheduled shift.

99. Ms. Shellady sent an email to Ms. Yarbrough about what staff had communicated to her and their desire to get the attention of corporate over their problems.

100. Ms. Shellady was scheduled to work at the store until 3 p.m. that day.

101. She informed Ms. Yarbrough in the email that she would close the store at 3 p.m. because she could not stay later due to a previously scheduled medical appointment. However, she stated that she would be back to the store on Sunday for her regularly scheduled shift.

102. Additionally, Ms. Shellady called Ms. Olivia Proof - the store manager at LUSH Lone Tree, and Tania Flores, store manager at LUSH Cherry Creek, to discuss the situation with them. She was not able to reach them right away, but both called her back eventually.

103. Ms. Shellady relayed to them the situation with her staff and her need to leave for a medical appointment. Ms. Flores and Ms. Proof, both advised her to lock-up and go to her appointment, reassuring Ms. Shellady that she would not "get in trouble" for doing so.

104. Two other MITs in the area, Shelby [LNU] and Sam [LNU], agreed that Ms. Shellady should hang a sign in the window of the store stating Boulder location would be closed and that customers could reach out to the Lone Tree or Cherry Creek LUSH locations, and that she should go attend her medical appointment.

105. Ms. Shellady was concerned about getting store coverage for the next day, as she wasn't scheduled to come in until the following day. She was advised later in the day by Ms. Proof and Ms. Flores that they would take care of the LUSH Boulder store that Saturday.

106. The following day, November 20, 2021, Ms. Shellady received a call from Ms. Yarbrough who informed her that LUSH was terminating her due to "multiple policy violations."

107. When she asked to describe the violations, [Ms. Yarbrough] told her "not setting the alarm, poor staff management, and multiple policy violations."

108. When Ms. Shellady came to the office on Sunday to return her keys, she found her office had been ransacked and handwritten notes that detailed two conversations that Ms. Shellady had with Mr. Dynes, Ms. Morgan and Ms. Yarbrough describing the situation with Mr. Hampton were missing.

109. In addition, Ms. Shellady was locked out of her corporate email and could not retrieve key emails relating to the situation with Mr. Hampton.

110. Ms. Dumpert, Ms. Sheriff, and Ms. Spiegel were all terminated from their employment on or about November 21, 2021.

## NATIONAL LABOR RELATIONS BOARD and CCRD CHARGES

111. On February 15, 2023, the National Labor Relations Board (NLRB) issued a Complaint and Notice of Hearing against LUSH Cosmetics LLC based on charges filed by Mses. Dumpert, Spiegel, and Sheriff for violating Section 8(a)(1) of the Act.

112. The NLRB complaint listed the following facts:

   a. That at various times between August and November 2021 Mses. Dumpert, Spiegel, and Sheriff concertedly complained about the actions of Mr. Hampton.

   b. That on or about November 19, 2021, Mses. Dumpert, Spiegel, and Sheriff engaged in concerted activities for the "purposes of mutual aid and protection, by conducing a walkout to protest their working conditions."

   c. That on or about November 20 and 21, 2021, LUSH responded to the walkout by terminating Mses. Dumpert, Spiegel, and Sheriff from their employment.

113. Pursuant to Section 102.20 and 102.21 of the NLRB's Rules and Regulations, LUSH is obligated to file and answer and was required to do so on or before March 1, 2023.

114. As of the filing of this complaint, the undersigned are not aware of an answer having been filed by LUSH.

115. As with the CCRD/EEOC, LUSH also ignored the NLRB – effectively ignoring all three governmental agencies.

116. LUSH not only chose to ignore the legitimate complaints raised by their employees and retaliated against them by terminating their employment, but they have also demonstrated a complete lack of accountability and transparency by failing to respond to inquiries from state and federal agencies regarding their practices.

117. By refusing to acknowledge its responsibility and comply with the legal obligations imposed upon it, LUSH has shown brazen disregard for the institutions established to protect the rights of workers and ensure compliance with labor laws.

118. Given that LUSH has ignored the combined weight of state and federal agencies, it is unlikely that any LUSH employee can seek redress for harassment, discrimination or retaliation.

119. LUSH's failure to respond is a pattern of behavior that demonstrates its willful and wanton disregard for its employees and the abuse they endured. It is clear that the company cannot be bothered to respond to inquiries from state and federal agencies.

120. In addition to harming the Plaintiffs, LUSH has undermined the integrity of the system and its actions set a dangerous precedent for other employers, should they escape accountability.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discrimination in Violation of the Colorado Anti-Discrimination Act
Disparate Treatment and Harassment Based on Sex
C.R.S. § 24-34-402(1)(a)**

121. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

122. The Colorado Anti-Discrimination Act, C.R.S. § 24-34-402, makes it unlawful to discharge, constructively discharge, or discriminate in the terms, conditions, or privileges of employment because of one's protected characteristics, including sex.

123. LUSH discriminated against Ms. Dumpert, Shellady, and Spiegel in violation of section C.R.S. § 24-34-402(1)(a) by subjecting them to harassment based on sex and/or disability

13

by means of offensive comments, physical actions, and normative-stereotyping, and by creating and tolerating an unlawful hostile work environment.

124. The offensive harassment described in the preceding paragraphs was and is sufficiently severe or pervasive to have altered the terms and conditions of employment for Plaintiffs.

125. The harassment and hostile work environment to which Plaintiffs were subjected to was perpetrated by LUSH manager, Logan Hampton, who had supervisory authority over Plaintiffs and occurred on a frequent and routine basis.

126. LUSH knew of the hostile work environment because Ms. Shellady communicated the concerns multiple times to corporate officers.

127. Defendant LUSH failed to take prompt or effective action to prevent, correct, or remedy the hostile work environment.

128. Defendants' conduct described herein violated the State of Colorado's antidiscrimination laws and constitutes a prohibited unfair employment practice thereunder.

129. The unlawful employment practices complained of above were intentional.

130. The unlawful employment practices complained of above were done with malice or reckless indifference to the state protected rights of Plaintiffs.

131. As a result of the events and actions described above, Plaintiffs suffered monetary damages and experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation.

## SECOND CLAIM FOR RELIEF
**Colorado Anti-Discrimination Act**
**Retaliation**
**C.R.S. § 24-34-402(1)(e)**

132. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

133. The Colorado Anti-Discrimination Act, C.R.S. § 24-34-402, makes it unlawful to attempt to commit any act defined as unlawful by the Act and to discriminate against any such person because that person opposed unlawful practices or engaged in other protected activities.

134. Plaintiffs engaged in protected activities, including, but not limited to, opposing disparate treatment and harassment as described above, and complaining to corporate officers about discrimination and harassment.

135. Plaintiffs engaged in protected activities, including, but not limited to, organizing to leave the store at the same time.

136. As a result of Plaintiffs' protected activity, Defendant subjected Plaintiffs to a retaliatory hostile work environment.

137. As a result of Plaintiffs' protected activity, Defendants ended Plaintiffs' employment.

138. Defendants' actions were meant to dissuade a reasonable employee from engaging in such activity in the future.

139. Defendant LUSH knew about the harassment and acquiesced it in such a manner as to condone and encourage the actions.

140. A causal connection exists between Plaintiffs' engagement in protected activity and the adverse employment actions taken thereafter.

141. Defendants' conduct described herein was done with malice or reckless disregard of Plaintiffs' state protected rights.

142. As a direct result of Defendant's actions, Plaintiffs have suffered significant injuries, damages, and losses to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests the Court enter judgment for the following relief:

    a. All declaratory relief and injunctive relief, as appropriate;

    b. Actual economic damages as established at trial;

    c. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

15

      d. Punitive damages as permitted by C.R.S. 24-34-405 (as shall be construed, interpreted, and applied in a manner that is consistent with standards established through judicial interpretation of Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and 42 U.S.C. sec. 1983);

      e. Pre-judgment and post-judgment interest at the highest lawful rate;

      f. Appropriate tax-offset, as allowed by law;

      g. Attorneys' fees and costs;

      h. Any other appropriate remedy available under law; and,

      i. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: April 7, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Siddhartha Rathod
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
sr@rmlawyers.com
at@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

16

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY<br>STATE OF COLORADO<br>1777 6th St.<br>Boulder, CO 80302 | DATE FILED: April 7, 2023 3:33 PM<br>FILING ID: D545893C5D82D<br>CASE NUMBER: 2023CV30250 |
| **SHAYLEY DUMPERT,**<br>**VICTORIA SHELLADY,**<br>**EVA SPIEGEL,**<br>**WHITNEY SHERIFF,**<br><br>  Plaintiffs,<br><br>**v.**<br><br>**LUSH COSMETICS, LLC d/b/a LUSH HANDMADE COSMETICS,** a foreign corporation,<br><br>  Defendant. | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff:*<br><br>Siddhartha H. Rathod, #38883<br>Azra Taslimi, #44317<br>Rathod ǀ Mohamedbhai LLC<br>2701 Lawrence Street, Suite 100<br>Denver, CO 80205<br>(303) 578-4400 (t) / (303) 578-4401 (f)<br>sr@rmlawyers.com<br>at@rmlawyers.com | Case No:<br><br>Division:<br><br>Courtroom: |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE-NAMED DEFENDANTS: <u>LUSH COSMETICS, LLC., d/b/a LUSH HANDMADE COSMETICS, a foreign corporation,</u>**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint.  If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated: 04/07/2023

                                          Clerk of Court/Clerk

                                          *s/ Azra Taslimi*
                                          Signature of Plaintiff's Attorney

                                          2701 Lawrence St. Suite 100
                                          Address of Plaintiff's Attorney

                                          Denver, CO 80205

                                          303-578-4400
                                          Plaintiff's Attorney's Phone Number

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.**

**WARNING:** A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal. The plaintiff has 14 days from the date this summons was served on you to file the case with the court. You are responsible for contacting the court to find out whether the case has been filed and obtain the case number. If the plaintiff files the case within this time, then you must respond as explained in this summons. If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.